Here ye, here ye, Ms. Honorable Heather Kornick for the 2nd Judicial District is now back in session. The Honorable Robert E. McLaren presiding. Please be seated. The second case on the docket this morning is 2-22-0197. Matthew Kornick, counter-defendant at the lead, v. Drew Goodman, counter-plaintiff at the house. Arguing for the appellant, Mr. Daniel E. Dunn. Arguing for the appellate, Mr. Daniel F. Hunter. Mr. Dunn, you may proceed. On behalf of Drew Goodman, I'm asking this court to reverse the summary judgment on count 1 of his counterclaim against Matthew Kornick for intentional infliction of texting of outrageous material to his 13-year-old boy. In the case, a 35-year-old male, Mr. Kornick, excused these perverse texts because he didn't inform Drew Goodman, the boy's father. And the circuit court fought that defense, despite this court's holding of Rekosch v. Parks. And please excuse me if I cannot pronounce Rekosch properly, but I couldn't find the proper pronunciation. But it may be inferred that the defendant was aware that the plaintiff was particularly susceptible to emotional distress would result from the outrageous conduct. In that case, it was disposal of the father's remains without their knowledge, consent, or participation. So the question I think to this court, if I might be forgiven for paraphrasing it, is concealment of outrageous conduct and excuse. And in the case of families, I think Rekosch gave us our answer. Without their knowledge, that's the answer. Instead of an excuse in this context, when you're sending letters in effect, worse than pornography, to 13-year-old boys, other people, families, the concealment, the fertility, the clandestine nature only demonstrates knowledge that the text will have an extreme impact on the parent, and particularly this parent. Did Mr. Goodman ever personally contact Mr. Kornick and say stop doing this? I mean, is there anything in this record that indicates or was most of this done through counsel? Mr. Goodman personally went to the Riverwoods police immediately upon installing the text. That was his response. And at that point, the text stopped. And the action proceeds from there. I think the photo text is kind of a trait to the forgery in the Rekosch case. Part of the cover-up of what is knowingly wrong doing. And in this case, Mr. Kornick admitted what he did was wrong after he first testified that he'd forgotten about the whole episode. And then he claimed, only then, that he didn't intend for Drew Goodman to see the text. Over what period of time did this occur? This took place, I believe, over from 17 to 18, approximately a year. As we point out in the briefs, after the order of protection was entered so that there would be no more surveillance, the text got increasingly disturbing and graphic. The text are in the record. Mr. Kornick did not put those texts in the record when he moved for summary judgment. Consequently, we put the text in the record. Was the divorce over at that time? Well, there was formal deals, but was the actual litigation in the trial court on the divorce over? No. This case was filed with the related case that you just heard simultaneously. And the text had pretty much ended by then. So the counterclaim was then filed in response to what was probably the fifth action that was brought against Drew by his parties. And the phone, I mean, this might seem like a simple issue, but the phone didn't actually belong to this child. It belonged either to the company or to Mr. Goodman himself, correct? It was a personal phone of Mr. Goodman's that he had trusted to his son. I don't believe it's in the record, but it's my understanding that these messages won't appear on your phone bill. So you won't necessarily see them when you get your bill. Doesn't the restatement indicate that a person who's harmed by outrageous conduct must be present when the conduct occurs? The question has been dealt with this court, I understand. And that's why we addressed it in our brief. But I believe that collapses the inquiry. Under the restatement, there's an either or test that we start with, which isn't really dependent on family. And that's outlined, I believe, a good place to see it is a motto that shows up in both parties' briefs throughout. The defendant either intended this conduct to inflict severe emotional distress or knew there was a high probability the conduct would cause such distress. So substantially contemporaneous knowledge of the outrageous conduct. Substantially. We don't really know when the presence would happen. So that's, I think, why oftentimes when we see this court's decision in Doe v. Montessori School or this court's decision in Rutgers Park, there really isn't substantially contemporaneous knowledge. In my case, even there, they found the correspondence after the deed was done. So what happens there, I believe, is what the court either gestalts or just takes a pragmatic approach and says, well, anyone would know that what I'm doing is going to upset that other person. And I think this line from Doe to Rakosh, I think it culminates in Judge Connelly's federal opinion in the A.J. versus Butler School. I think she has like a grand unified theory. And if I might quote it, any reasonable person in defendant's position would understand that an attack on one's children would be highly likely to cause the parent's severe distress. So that does bring us to Doe v. Montessori. I think what happened here was the circuit court truncated the analysis, never got beyond the, let's call it, specific intent component of her statement, never got to the knowledge of the high probability, never got to, since it never addressed that, it never really addressed the comment Justice Shostak is talking about, which is the presence requirement. And that one is dependent on family. That one is really triggered by status. Isn't one of the issues, I mean, going outside of the restatement and going outside of whether it needs to be contemporaneous, isn't then any injuries or any, whether or not this individual did suffer, isn't that a question of fact for the trier of fact? Well, I don't think there was a question of fact for the trier of fact. That is clearly a question of fact. And certainly... I mean, the fact that you have a, and I don't know, but it's indicated in the record that, is the kid on the spectrum or something? Is that relevant? Well, I think it's relevant to both, it's relevant to the vulnerability of the child, of course. But in this case, it's also relative to the vulnerability of the parent. Because obviously any parent is going to be especially distressed. If this was an 18-year-old, believe me, the parent would be distressed, but I know, you're just distressed. I mean, that comes with having a teenager. But when you've got a 13-year-old who's vulnerable, post-divorce, you've got parents, the mother's imprimatur for this person who's an outsider in the family, sending these vile texts which could get him expelled from school. God knows he could, I mean, they bring people in for sexting, teenagers for sexting all the time, and try to charge them. This is going to upset any parent. I mean, if the court wanted to go out like that. Let's back up a little bit. Any parent. Doesn't this record indicate that the mother knew about these texts and actually said, go ahead, send it? I approve them. Yes. I don't know exactly what transpired, but I think we've got some deep cross-currents going on here. Some what? Deep cross-currents going on here. As Justice Hutchinson mentioned, there's a lot of litigation, there's a lot of records, there's a lot of filings, there's a lot of obligations that we're continuing on after the divorce. It doesn't do you any good if you're going to both be suing the ex-husband to have one of your co-plaintiffs in prison. So obviously, that's going to be something you might say. And that might be a reason why prosecutors, even though they could prosecute it, certainly could, would defer. Because you've got scarce prosecution resources. You're not going to devote it to a case where it turns out that you're going to have one parent testifying against the other parent. From this record, I don't think there's any question that the cause, Andrew, was that he discovered these texts. He found them on the phone that he owned. So I don't want to gloss over the presence requirement. I don't think the court needs to reach it. I think you could just go on, doh, ricoche, and apply AJ, which is kind of a culmination. And I think where it surfaced in this court's and the first district's prior precedence is because that knowledge is missing. For example, the Green case. Nobody knows the mom's relationship when the newspaper photographer was taking a picture of the 18-year-old on the slab. But they do know later on when she tries to get in the hotel. So I think when, for example, you're getting legitimate treatment, abortion counseling, psychiatric services, and the courts, the Benton case where it's a little league investigation, we follow the Illinois Supreme Court and collegias and we say, wait, you're going to get some distress. And we're going to kind of give you a pass. And that presence requirement then operates as a filter for those types of cases where the outrageousness really isn't quite so demonstrated. It only has to surface in those cases. But even if we were to go there, as you see from the cases in our brief that are cited, cases from other jurisdictions, it basically says it's unnecessary under comment one or comment I. It's only a filter. It's only meant to apply when it should apply. And it's not necessary if the defendant knows there's a high probability that it will cause defense, a distress. And that's the DCC case at the State of Hester. And in the other District of Columbia case, some forms of outrageous behavior that are directed in the most immediate sense at one person can be directed at others who are not present. I submit this filter really isn't necessary here. I think Judge Pinelli certainly didn't think it was necessary. None of these federal cases have had any difficulty interpreting what this court is telling them. This court's telling them that when you target children, a lot of the analysis merges and collapses. And I think that's all guidance from Nicoleta's case, where they say if it's intolerable in a civilized society, we really don't have to employ these filters. And that's, I think, when we're dealing with minor children affected by outsiders. I think if you wanted to distill this case down to five words, other people's kids off limits. And I think that's what any parent would think, but particularly on this record, what Mr. Goodman would be thinking. And therefore, I think we really have a very good line. And when we're dealing with virtual access, how is presence even supposed to be decided? It's almost a theological question. It's like Schrödinger's cat. We're not going to know who's present when, when everything is in the electronic ether. But I think the two Massachusetts cases we cited, really this court should take to heart. And that is that if we're going to have this presence policy on this back situation, and the Casper v. Corley case points it out, you're promoting a power imbalance where the victimizer uses his adult status or other status to either conceal or promote or coerce the son to hide it from his father. And that is not, I'm sure, the policy that this court wants to adopt and certainly wouldn't survive, I think, any reading of Rekosch. And if you want to know, if you're concerned about where the filter cuts in and cuts out, I think Corley laid it out perfectly fine. The defendant who knew about the close relationship and covered up the killing or the accidental death however he wanted to claim it, he was not the one who didn't, who just participated. He was not. The sister, she had no cause of action. No one even knew she was a player in the case. No one knew she existed. So if the court wants filters, they're available. I'm not sure many moms and dads in Illinois would want those filters, obviously. But if there is a concern, then the weapons are there. And I think just like Justice Cannelly's decision, the Beal v. Broderick case gives you a good rule of decision. The defendant's never intended to direct any extreme or outrageous conduct toward the parents of a 10-year-old girl who was sexually assaulted. He certainly hoped, perhaps this year, though that's to be determined at trial, that neither of her parents would ever learn of any such conduct. But it's a question of back to the jury, whether the defendant's acted recklessly or indifferently to the likely effect of their conduct on family members who are apt in time to learn of it. I think that's really where this court has been trying to go. Well, that's where we're at when we're talking about a motion for summary judgment, correct? Correct. So the ultimate issue is, after you get past whether or not the restatement allows the dad, who is not present, to suffer, then the ultimate question here is, is it an issue of fact or detritic fact? Right. I don't think there's any question about that. It's not going to contest it. I mean, this is really a very narrow appeal on a very narrow question. Clearly, the trial court found everything correctly, and our complaint would be you probably would have found this correctly, too, but for the family unit. Well, you know, your opponent indicates that that Rico's case is not applicable because the facts in that case were so much more egregious than the facts here. What's your response to that, whether the facts alleged here are not as egregious? Is that relevant? Well, if you're talking about the disposal of your father's remains, I would suggest that misconduct, corruption, and abuse of a 13-year-old boy is much more serious. If I were going to analogize those two cases, I would take the case of the Clarence Rodonchio, which is the car spotted with Nazi figures. It's your father's remains, but it's still a live person. But I think, I mean, I guess my question is the same question I've been going back to. The egregiousness goes to the amount of damages, which would be an issue for the trial effect. Correct? Correct, but it goes to more than that, I think, under Kalegas. I think when Kalegas is talking about intolerable in a civilized society and then they're talking about how the theory collapses, and I think it was Justice Connelly that picked up on that and said, you're basically merging these concepts. Right. And I suggest this is the paradigm case if you wanted to merge those concepts. This is where moms and dads can't be there 24-7 as much as they want to be. I've got a 25-year-old engineer in Colorado, and if my wife could put a tag on him 24 hours, we would have one. That's how moms and dads feel about it. That's why we assume, and we don't require medical and psychiatric testimony, because what do dads do when this happens? Well, if they don't go down the street and punch you in the face, they go to the police. They don't go leeching through the Yellow Pages looking for a therapist to help them out when their family's in trouble. That's what happens in a case like this. So unless the court wants to direct additional questions, I'll just close by saying what we have here was just simply a truncated analysis. And a jury should decide if the counter-defendant knew there was a high probability that texting further perversions to a 13-year-old developmentally challenged boy would distress the boy's father. And even if we somehow decide that that's not a question of fact, his fate of knowledge, well, then the father should still recover because of his status as a father, and he should do it under the relaxed presence requirement that the restatement under comment I clearly allows for these types of cases, for the abuse of minors on social media. If the court wants to add to either one, it could. I have nothing further. Thank you. Thank you very much for your time, Your Honor. I have a question. Yes. Your prayer for relief is somewhat unusual. Dr. Dotson is back. For application of, I believe, the common law and types of cases, I would like some clarification as to whether it is your belief that there are material issues of fact that preclude summary judgment being granted to the defendant, and or whether you believe summary judgment should have been granted for your client, or as you state in your prayer, that it be remanded for a specific form of application of law. And you're talking about in the briefs and not in the counterclaim itself? I'm talking about the prayer for relief in your first brief. In the brief. It's because the analysis was not completed. We didn't move for summary judgment in this case. In other cases, we cross-moved. But in this case, we did not. You should get summary judgment in your favor? I am not going to suggest that, Your Honor, because You never filed a motion for summary judgment. I never filed such a motion. Yes, you did. I mean, if you took my presentation at 110 percent, I think your remand would basically say give him summary judgment, and we'll have a trial on damages. I didn't ask you for that. I think that if we applied to Cannelli, and that was your rule of law that you handed down, Cannelli's version of it, I don't know that I would ask for summary judgment. The future is unknowable. Okay. Good answer to my question. Thank you, Your Honor. I'm glad I did. You'll have an opportunity to make rebuttal. Thank you, Your Honor. Thank you. Mr. Konisek, you may proceed. Good afternoon. May it please the Court, my name is Daniel Konisek, and I represent Mr. Kornick in this issue related to summary judgment. The statement by counsel is that the circuit court, I believe he said, completely missed the ball as it related to a defense under Rekosch and the restatement 46, subsection 2, subparagraph 2. The circuit court in this case was never presented with Rekosch. The circuit court in this case was never presented with the restatement 46, paragraph 2, closed paragraph. The circuit court in this case was presented with one argument in response to summary judgment that we filed as it related to intent, and that response relied solely on the decision in the Doe case. Are you saying that since they didn't argue those cases down below, they can't argue them up here? Is that your position? No, it's not, Your Justice, but I want to make a point on that. Go ahead. I'm sorry to interrupt. When the circuit court decided, as you pointed out, Justice McLaren, what did it decide the case on, and it was whether or not there was a material issue of fact as it related to the facts that were presented to it. And the facts that we presented to the court was that there was no issue relating to intent, and intent being, who were these disgusting e-mails or text messages being sent to. And in addressing that, the circuit court stated that there was no issue of fact because none was created that any of the text messages were ever sent to Drew Goodman. And the court said, in fact, and this is at the record C447, the trial court's order, he said there exists no evidence that Kornick intended that Goodman ever see the texts. In fact, exactly the opposite indicated that Kornick intended the texts to be seen by the minor child in this case. I think that's the whole issue that we're here for, sir, is did they have to be intended to be seen by the father? Yes. I mean, the restatement, as I said before, indicates the person who's harmed by the outrageous conduct must be present, but the provision is not always interpreted strictly. There's a lot of case law, as cited by your opponent in his brief, that doesn't say it has to be strictly interpreted. So is the trial court wrong in saying Dad had to be the intended target? And, Justice, that's my point, is the trial court was never given the opportunity to address 46, Section 46-2. But the trial court said that Dad wasn't the intended target, and that's why he granted the motion. Yes, because the ---- But doesn't the trial court have every opportunity to research an issue as well before they rule? No. Did it have to be spoon-fed every single argument? No, not at all. And I don't think that ---- Well, that's what it sounds like you're telling me. No, the trial ---- The trial court didn't have the opportunity to listen to that particular argument, therefore they weren't given all of the case law in order to rule. That's their job as a trial court judge. No, factually. Factually, the trial court was not presented any evidence. Factually. What evidence? That there was intent that these text messages be reviewed by Mr. Goodman. That's what the trial court based its ruling on. They're wrong, aren't they? No. I mean, does there have to be intent found that it is intended that the dad see these? Yes, and that's exactly why Section 46A2 should have been argued, but I'm not saying it's been waived. 46A2, Your Honor, is justice, is the exception. So it says if the victim in this case, which would be the child, right? If the victim is the intended target, which clearly here, and I don't think we can call it a victim, and I'll get to that in a sec. We'll call it the child. Just call it the child. The child is the intended target. That is the target. The child is the target. So under a direct action, which is the Rekosh case, Justice, which is exactly what you decided in that case, the direct action for the intentional infliction is absolutely distinct and separate from a 46A2, which says you are not the primary target, but you happen to be somebody in the zone of protection, which the restatement says it's very limited to certain requirements that you be close family and that you be present. Right? That's what the restatement says. So we're not, Justice, we're not operating under the first direct action. And that's, even in their own briefs, everything they cite in the brief, and what he just argued to you, saying there's a family member exception. They say it in the briefs over and over. Okay. So the question is, is this family exception? Is there any case law that says, oh, we're going to take away the requirement of presence? That's the issue that you just asked me about, Justice. And I would go to the Chemansky case, which is exactly a case that they decided, that they cited. And in Chemansky, the court specifically addressed the very issue that we're discussing here today, and addressing whether or not the presence requirement should or should not be something that we should continue with. And in the Chemansky case, Justice, the court said if we were to take away that particular section, and this happened to be in the 12B-6 memorandum that the trial court there issued, but it also discussed in the summary judgment proceeding. It said, following the logic that we should somehow, under 46-2, take away the element of being present, it said that you would undermine the very purpose of that section of the restatement. Justice, the court there said you would undermine the purpose of that section. So what the Chemansky court said, relying on 46-2, it went to the Green case. And that's the case, and that is the only case in Illinois. By an Illinois appellate court, not by a district court judge or some judge from another state, it is an Illinois appellate court that addressed then the very issue, Justice Shostak, that you asked about. Is there some type of merger? Should we collapse? Should we take away the requirement of the present? In the Chemansky opinion, the court said doing so would completely undermine section 46-2, and you would simply have then a direct action which is not meant under the restatement. In Chemansky, ultimately, the court said I can get around it, and he did it on a motion. What he said was a motion to reconsider Judge Manning, and Judge Manning said there was a direct action because in that case, the police officer specifically took the husband away from the wife while they were at the house when the child is dead from SIDS. Kept the husband away from the wife, and they said, of course, Justice Shostak, any wife would want to be with her husband at the hospital when the child dies and said it was a direct action. You compare that then, not from a district court, although I think Judge Manning did an excellent job discussing section 46-2. You know, in Illinois, Last point, on that, then what he did, Justice Manning said let's look at the Green case because that is the only case in Illinois that addressed the very issue about whether or not we should somehow collapse or take away the presence requirement, and in Green, the court specifically said it is not going to do that. This is the case where the son was shot. He's in the operating room, and the Chicago Tribune photographer goes in there, blocks the mom out, doesn't let the mom see the son being operated on, photographs the incident, and then later when the son is transferred to another room because he's died during the operation and he's on a bed dead, once again, the Tribune's in there, and the mom comes in, and now she's saying prayers over her son, and the Tribune reports that, quotes her, and puts it in the paper with the picture. The court said that's actionable as a direct action because it directly involved the mom, but when it went to the picture, when it was taken without the mom in the room, the court said that would be something under 46A2, and presence was required and the mom wasn't present, and it said there is no cause of action. How old was the child in that case? How old was the child? I don't know, Your Honor. I don't know. I can't answer that question. Which brings a good question. I mean, we're in a different time in our society right now, and you have a lot of social media. You have a lot of, I mean, how, you know, where kids are communicating with older people online, and, you know, those types of things, a lot more back and forth on the Internet, a lot more back and forth on texting. Young kids have phones. I mean, aren't we, aren't you moving away from where it would be a protection for the child with expanding it so it's not you have to be there to see it, you have to be a part of it, you have to be direct? I mean, how is it that this father should not feel distress when his son, who is, from what I'm reading, special needs or on the spectrum, receiving these types of text messages? How would this not distress a father, and why should he be not entitled to recover under a case like this? Okay. I mean, I understand all the cases you're saying, but there are a lot of other cases as cited by your opponents, which you might want to address, that go the other way. No. In fact, the Casper case that he cites does not go the other way. The court specifically said in Casper that you still have to show intent, and then the only analysis that can be done. How about Bubber School? The Bubber School was, again, a direct intent. It has to be something that's directly done, in this case to Drew Goodman. What's the answer to your question, what are we supposed to do because we're in a digital age? We're in a digital age? No. So the question is, Mr. Goodman is seeking a cause of action on his own, not on behalf of the child. And that's the wreck, I'm sorry, not the wreckage case, but the Doe case, Justice Hutchinson, where you were very clear that the cause of action is the child's and the parent's derives from that, which is different because the child here, you said that's on the spectrum. There's one blurb in this record, one blurb that says the child, and I don't think it said spectrum. No, I don't think it did either. I think it said something about, I don't want to label the child without knowing exactly his diagnosis, which is why I said spectrum. There was nothing in the record before this court on a summary judgment, on a 210-05, that said the child suffered anything as a result. It was in the record somewhere. There is nothing. Well, I didn't just make it up. I didn't say it without thin air. That the child suffered as a result. There is nothing in the record that the child suffered. I think the term I read may have been autistic. No, I mean it suffered as a result of receiving the text. Okay. We're talking about two different things. Mr. Consant, I'm not, I don't, yes, I do care if the child's autistic because I'm very familiar with that circumstance. What I'm concerned about is this boy is 13. Yes. That one we got clear. Yes. He's no younger. He's no older. Yes. He has two parents who at some point gave him a phone. You know, he's had a phone for longer than just this incident. What reasonable parent will not look at a 13-year-old's phone to see any and all transactions that have occurred? And if you can give me a case that says it's not reasonable for them, I'll listen to you. But you're not going to find one. I anticipated that question. Oh, good. Did you find the case? No, I didn't. No, you didn't. Because it doesn't exist. Well, no, the question is what reasonable parent. And I would suggest to you, Your Honor, and this is nowhere in the record, it could have been developed in the record, an affidavit could have been presented in the record that said Mr. Goodman constantly checked the cell phone. You don't have to, sir.  The child is not an adult. And we even have that concept that you may or may not be familiar with of the emerging adult in criminal where it says that a male's head, brain, is not actually finished developing until he's 28 or 30. And I even dispute that sometimes. I dispute it, too. I'm very clear. But let's go back to 13. You're going to see what your child is doing if you care about your child. And that doesn't have to be identified in a sworn pleading. That is a matter of nurture and nature. I completely agree. And what I was going to say is you said what reasonable parent. I could argue the exact opposite. What reasonable parent would allow the kind of garbage that goes on TV and let kids watch it? What reasonable parent would allow the social media that occurs in our country? And you can't say that it doesn't happen because it does. It does. And it can drop just as easily as it goes on. And it doesn't, and we know that. What reasonable parent could say, there is nothing in the record here? What you and I disagree on, that's one thing. My point is that there are the reasonable parents, in my opinion, when we look at what's going on here. And if we want to get into that debate where kids can walk into a hospital and have their gender changed without having to involve their parents. That's not what this is about. This is about Drew Goodman checking what his child is doing. That's exactly right. What do you think needed to be in the record in order for us to find, I don't know what you're talking about, a reasonable parent. What are you saying is lacking in the record? Justice Huston asked me about a reasonable parent. In the record there would have been that in order to show intent under the direct action, which can't be because there was no direct action against Drew Goodman in this case. So under 46-2, that the court knew based on either phone bills, court knew based on comments, court knew based on statements that the text messages would be reviewed by Drew Goodman. There is nothing. Drew Goodman could have testified or provided an affidavit that I constantly reviewed my son's text messaging. Was this not the Drew Goodman that spent $1.5 million on following his wife, surveilling his wife? Yes. So would you find it unusual if he was looking at his children's phones? Well, I would because we know, as was pointed out before this court, an 18-month time span occurred here when these were happening and it wasn't found. So I would expect, yes, that in that case Mr. Goodman would have said, let's see the phone. Let's go through the text messaging. And I would suggest that. Does he know he didn't do that? I know in the record it says nothing that he did. And when we filed the summary judgment, he had every opportunity to say I did. Okay. Counsel, your time is up. Any other questions? No, thank you. I have a few. Counsel, have you ever heard of a direct and indirect contempt? Yeah, I just, the Appellate Court, Third District, I was in that recent opinion. The cases that it seemed that you were citing were direct in the sense that they were like a direct contempt. They happened in the presence of the court. Or they happened in the presence of the person who happens to be the plaintiff. I'm having a hard time accepting, and maybe you can convince me, that a text message is a direct confrontation, communication, as opposed to an indirect communication. And if it's indirect, and it is read by the child, if the father happened to be there and read the text at the same time, would that be a cause of action recognized in the state of Illinois? Yes. And here's why, Justice. Is because, and if we go back, if we go back to the Doe case versus Montessori, the parent's action is derivative. So if the son, in this case, has a reaction to what was sent to him and is viscerally disturbed, and the father sits there and witnesses, that's the whole 46A2 point, and witnesses the visceral reaction of his son, that's the purpose of that restatement. Otherwise, it's secondary, like in the indirect portion that you're talking about. And I don't make the rules. That's what the rule, that's what 46A2 requires. You just added an extra circumstance, though. He saw the visceral reaction of the child. In your example, maybe a child does not understand, a child of 13 does not understand he should have a visceral reaction. Because kids of that age, pardon my language, like fart jokes, especially boys. They like these types of things. So maybe this young man didn't know he should be viscerally upset. But the cause of action is what we're looking at. And when we look at it, if it's not a direct action, which it can't be. Well, that's what Justice McClaren is talking about. If it's an indirect, then it requires a derivative. There has to be some harm to the target person. If you go read, if the Green case discusses it, the Shemansky opinion by Manning, it really gets into it and makes the distinction. I'm not saying that some idiot that sends these types of texts should get away with it. I mean, you know, counsel says, oh, the police station is first place. That may be the second place I go after I deal with it directly. But the point is we're here on a cause of action. That's called intentional infliction of emotional distress, and there's a framework where you can recover. And again, I didn't make it up. I'm doing what the law says. I assume you may not be aware of the fact that a code of judicial conduct was recently passed or approved and acted by the Illinois Supreme Court. And it basically says, in a nutshell, we're not supposed to communicate digitally anymore. Because if we do, it's forever. And I think it's acceptable to suggest that it's reasonable to conclude that people who use digital media to communicate realize that it is forever unless it happens to be obliterated by destruction, deletion, or something. And so is there a case on point that suggests that if you send an email, a text message, an Instagram, or whatever that's digitized, and on social media, one did not intend that third parties, be they parents, friends, associates, or whatever, did not intend that this would be seen by people, even though this thing supposedly exists for as long as it's not deleted? In terms of social media, I agree. If you put something up there on Facebook, TikTok, whatever else this is, man, it's open season. And I think, and I can't address this in terms of a case law, but I don't think there's any doubt that sending a text message is something personal, period. I'm sorry? Sending a text message is completely different than posting on social media. It is personal. You send text messages to your spouses, and you don't expect that some third party is going to come in. I mean, so that happens. Do parents expect to read text messages? I disagree that that is what happens today in this society. I truly do. I do. Do parents have a right to look at their children's text messages? It's a philosophical debate we're having. No. If they don't have a right to tell their kid you can't get a sex change, you can't go to a doctor, you get special counseling at a school, I'm willing to have that debate. The way we are going in this country, no, in fact, I can't see justice. We're not going to have that debate. We're not going to have that debate here today, counsel. Okay. What I'm asking you, a parent who pays for the phone, who has a child who's a minor, are you saying they have no right to read their kid's text messages? I can't answer that legally. Do you have a right to go into your child's bedroom and open the drawers and look through the drawers? I can't say that. I'm certain that part is not improper or illegal. Okay. Good. Based on my experience. The only time my kids were doing it. But that all may well be, and we don't have to have the debate. The issue is, is it a direct action, or we're under 46A2, and it's under 46A2, presence is required, and it did not happen here. Thank you. Thank you. Sue, anything? Nothing. Thank you, sir. It's the longest, close, capitalist argument with questions that I've ever experienced. All right. I think that goes to the merits of the question before the court. Right. Let me ask you, he relies heavily on Green in this Schumanski case. Can you distinguish those cases from this case here? I don't want to distinguish Schumanski. I'm going to rely on it because the spouses prevailed on summary judgment, and Judge Manning looked at Rakosh, and she interprets it pretty much the way I interpret it, with respect to both the presence requirement in the first decision and with respect to the liability on the denying summary judgment to the defendants. If anything, how could the contact in Schumanski be worse than this kind of thing? We're talking about law enforcement officers acting under the color of law trying to solve a crime. That's nothing like what's going on here, where we've actually got state and federal statutes criminalizing this. Perhaps the reason why there's no cases, Judge Hopkins, is it makes no point to sue people in federal prison over the sexting of kids. That's probably why there's no cases. And I understand this judo where we're blaming parents for not being there 24-7 to prevent people from surreptitiously accessing their kids through virtual media. I do want to clear up one thing. Well, let me ask. Certainly. Counsel said in response to my question that there was no direct response, be it in my affidavit or testimony, from your client about how he found out, what he found out. Well, we know what he found out because we have it in the record, but how he found that out. Do we have anything in the record that indicates that? I don't believe so because there were no questions asked in the deposition about this. I think that was a tactical decision by the other side. The declaration was really. . . Let me ask one other question. Was the deposition related directly to this case or was it related to one of the other cases that we know existed before? This case was consolidated at the time. Okay. And I think the declaration that Drew filed for the summary judgment just says that he found out. I would have to go off the record to explain how he found out. We won't do that. Okay. I do want to point out that counsel did get it reversed, I believe, as you look at the summary judgment papers. We cited Rakosh. We didn't cite Doe because Doe has all these complications that didn't become apparent until we needed to go to the reply briefs. We didn't think we had to spend a lot of time on this. We thought Judge Hoffman had already decided this when he viewed it on the motions to dismiss. So we were quite surprised when Judge Smith reversed field. What we did, I think, as this Court has realized, thought that this is something that was really worthy of taking up, and we let the rest of the counterclaim go by. With respect to the different standards, I think there's three, specific intent. We could call the other one recklessness, and we could call the other one based on family unit status. But I think the point that this Court was making in Doe and then in Rakosh is that the knowledge, the family unit, is always important because it bears on the knowledge, which wasn't present in Green. In Green, she lost when the news photographer didn't know. She won when they knew. And I don't think it really made that much difference that we have an 18-year-old homicide victim on the slab. It's different, as you pointed out, to a 13-year-old. And if you want to see the questions of how the boy was affected, you can find some of that in his declaration, and you can find some of that in Dr. Rappaport's reports. So your memory was correct, just such. So I'll just leave it with Doe, which I thought solved this problem. When it said we had an infant, we pretty much appreciated the abuse because obviously we're not there. But this Court held. Some claims didn't survive. Some claims were derivative. Some claims might have been indirect. Some claims might have been negligence. But this Court held it could sue for intentional infliction of emotional distress. And I think that's some black-letter law that I think the federal courts have had any problem interpreting. And I don't really think that it's a good policy for decision to start laying this excuse on parents that they weren't sufficiently vigilant. And if the Court has no other questions, I will retire and just ask you to reverse and remand with instructions. I can see Justice McClaren is pondering, and I will wait here as long as it takes. Well, I was going to make a reference to Black Lives Matter. Oh, there we go. Which is a takeoff on the acronym. But I've decided that I'm not going to ask you a question relating to the arguments that you made in rebuttal. And I would only advise in the future that when you file a prayer for relief that you use boilerplate. I plead guilty to creativity, Your Honor. But other than that, I'm not sure which one of us was saved by the bell. Very well. We'll take the case under advisement.